FILED '10 AUG 9 11:03USDC-ORM

# UNITED STATES DISTRICT COURT

## DISTRICT OF OREGON

Case  *10-3073-CL*    #

Plaintiff,    *Tamie Richardson*

vs.

**ORIGINAL PETITION**

*First Horizon Home Loan Corp.*

Date: *8/9/10*

Comes now , hereinafter referred to as "Petitioner," and moves the court for relief as herein requested:

## PARTIES

Petitioner is , .

Currently Known Defendant(s) are/is: , , , , by and through its attorney.

## STATEMENT OF CAUSE

Petitioner, entered into a consumer contract for the refinance of a primary residence located at ,
hereinafter referred to as the "property."

ORIGINAL PETITION                                                                1 of 1



Defendants, acting in concert and collusion with others, induced Petitioner to enter into a predatory loan agreement with Defendant.

Defendants committed numerous acts of fraud against Petitioner in furtherance of a carefully crafted scheme intended to defraud Petitioner.

Defendants failed to make proper notices to Petitioner that would have given Petitioner warning of the types of tactics used by Defendants to defraud Petitioner.

Defendants charged false fees to Petitioner at settlement.

## IN BRIEF

### *(Non-factual Statement of Posture and Position)*

It is not the intent of Petitioner to indict the entire industry. It is just that Plaintiff will be making a number of allegations that, outside the context of the current condition of the real estate industry, may seem somewhat outrageous and counter-intuitive.

When Petitioner accuses ordinary individuals of acting in concert and collusion with an ongoing criminal conspiracy, it tends to trigger an incredulous response as it is unreasonable to consider that all Agents, loan agents, appraisers, and other ordinary people, just doing what they have been trained to do, are out to swindle the poor unsuspecting borrower.

The facts Petitioner is prepared to prove are that Petitioner has been harmed by fraud committed by people acting in concert and collusion, one with the other. Petitioner has no reason to believe that the Agent, loan officer, appraiser, and others were consciously aware that what they were doing was part of an ongoing criminal conspiracy, only that it was, and they, at the very least, kept themselves negligently uninformed of the wrongs

ORIGINAL PETITION                                                                    2 of 2

they were perpetrating. Petitioner maintains the real culprit is the system itself, including the courts, for failure to strictly enforce the consumer protection laws.

## CAREFULLY CRAFTED CRIMINAL CONNIVANCE

*(General State of the Real Estate Industry)*

### THE BEST OF INTENTIONS

Prior to the 1980's and 1990's ample government protections were in place to protect consumers and the lending industry from precisely the disaster we now experience. During President Clinton's administration, under the guise of making housing available to the poor, primary protections were relaxed which had the effect of releasing the unscrupulous on the unwary.

Prior to deregulation in the 1980's, lenders created loans for which they held and assumed the risk. Consequently, Americans were engaged in safe and stable home mortgages. With the protections removed, the unscrupulous lenders swooped in and, instead of making loans available to the poor, used the opportunity to convince the unsophisticated American public to do something that had been traditionally taboo; home buyers were convinced to speculate with their homes, their most important investment.

, Ameriquest, Countrywide, and many others swooped in and convinced Americans to sell their homes, get out of their safe mortgage agreements, and speculate with the equity they had gained by purchasing homes they could not afford. Lenders created loans intended to fail as, under the newly crafted system, the Lender profited more from a mortgage default than from a stable loan.

Companies cropped up who called themselves banks when, in fact, they were only either subsidiaries of banks, or unaffiliated companies that were operated for the purpose of creating and selling promissory notes. As will be demonstrated, these companies then

ORIGINAL PETITION                                                    3 of 3

profited from the failure of the underlying loans.

### *HOW IT WORKS*

Briefly, how it works is this, the Lender would secure a large loan from a large bank, convert that loan into 20 and 30 year mortgages and then sell the promise to pay to an investor.

People would set up mortgage companies buy securing a large loan from one of the major banks, then convert that loan into 20 and 30 year mortgages. In order to accomplish this an Agent would contract with a seller to find a buyer, bring both seller and buyer to a lender who would secure the title from the seller using the borrowed bank funds for that purpose, and then trade the title to the buyer in exchange for a promissory note.

The lender then creates a 20 or 30 year mortgage with money the lender must repay within 6 months. As soon as the closing is consummated, the promissory note is sold to an investor pool.

The lender signed over the promissory note to the investor at the time of the trade, but did not sign over the lien document (mortgage or deed of trust). The State of Kansas Supreme Court addressed this issue and stated that such a transaction was certainly legal. However, it created a fatal flaw as the holder of the lien document, at time of sale of the security instrument, received consideration in excess of the lien amount. Since the lien holder received consideration, he could not be harmed. Therefore the lien became an unenforceable document.

This begs the question: if keeping the lien would render it void, why would the lender not simply transfer the lien with the promissory note? The reason is because the lender will hold the lien for three years, file an Internal Revenue Service Form 1099a, claim the full amount of the lien as abandoned funds, and deduct the full amount from the lender's tax liability. The lender, by this maneuver, gets consideration a second time. And still the

ORIGINAL PETITION                                                          4 of 4

lender is not done profiting from the deal.

After sale of the promissory note, the lender remains as the servicer for the investor.  The lender will receive 3% of each payment the lender collects and renders to the investor pool.  However, if the payment is late, the lender is allowed to assess an extra 5% and keep that amount.  Also, if the loan defaults, the lender stands to gain thousands for handling the foreclosure.

The lender stands to profit more from a note that is overly expensive, than from a good stable loan.   And where, you may ask, does all this profit come from?  It comes from the equity the borrower had built up in the home.  And still the lender is not finished profiting from the deal.

Another nail was driven in the American financial coffin when on the last day Congress was in session in 2000 when restrictions that had been in place since the economic collapse of 1907 were removed.  Until 1907  investors were allowed to bet on stocks without actually buying them.  This unbridled speculation led directly to an economic collapse.  As a result the legislature banned the practice, until the year 2000.  In 2000 the unscrupulous lenders got their way on the last day of the congressional session.  Congress removed the restriction banning derivatives and again allowed the practice, this time taking only 8 years to crash the stock market.   This practice allowed the lender to profit further from the loan by betting on the failure of the security instrument he had just sold to the unwary investor, thus furthering the purpose of the lender to profit from both the borrower (consumer) and the investor.

The failure of so many loans recently resulted in a seven hundred and fifty billion dollar bailout at the expense of the taxpayer.   The unsuspecting consumer was lulled into accepting the pronouncements of the lenders, appraisers, underwriters, and trustees as all were acting under the guise of government regulation and, therefore, the borrower had reason to expect good and fair dealings from all.  Unfortunately, the regulations in place to protect the consumer from just this kind of abuse were simply being ignored.

ORIGINAL PETITION                                                                              5 of 5

The loan origination fee from the HUD1 settlement statement is the finder's fee paid for the referral of the client to the lender by a person acting as an agent for the borrower. Hereinafter, the person or entity who receives any portion of the yield spread premium, or a commission of any kind consequent to securing the loan agreement through from the borrower will be referred to as "Agent." The fee, authorized by the consumer protection law is restricted to 1% of the principal of the note. It was intended that the Agent, when seeking out a lender for the borrower, would seek the best deal for his client rather than who would pay him the most. That was the intent, but not the reality. The reality is that Agents never come away from the table with less than 2% or 3% of the principal. This is accomplished by undisclosed fees to the Agent in order to induce the Agent to breach his fiduciary duty to the borrower and convince the borrower to accept a more expensive loan product than the borrower qualifies for. This will generate more profits for the lender and, consequently, for the Agent.

It is a common practice for lenders to coerce appraisers to give a higher appraisal than is the fair market price. This allows the lender to increase the cost of the loan product and give the impression that the borrower is justified in making the purchase.

The lender then charges the borrower an underwriting fee in order to convince the borrower that someone with knowledge has gone over the conditions of the note and certified that they meet all legal criteria. The trustee, at closing, participates actively in the deception of the borrower by placing undue stress on the borrower to sign the large stack of paperwork without reading it. The trustee is, after all, to be trusted and has been paid to insure the transaction. This trust is systematically violated for the purpose of taking unfair advantage of the borrower. The entire loan process is a carefully crafted contrive connivance designed and intended to induce the unsophisticated borrower into accepting a loan product that is beyond the borrowers means to repay. With all this, it should be a surprise to no one that this country is having a real estate crisis.

## PETITIONER WILL PROVE THE FOLLOWING

ORIGINAL PETITION                                                                    6 of 6

Petitioner is prepared to prove, by a preponderance of evidence that:

- Lender has no legal standing to bring collection or foreclosure claims against the property;

- Lender is not a real party in interest in any contract which can claim a collateral interest in the property;

- even if Lender were to prove up a contract to which Lender had standing to enforce against Petitioner, no valid lien exists which would give Lender a claim against the property;

- even if Lender were to prove up a contract to which Lender had standing to enforce against Petitioner, said contract was fraudulent in its creation as endorsement was secured by acts of negligence, common law fraud, fraud by non-disclosure, fraud in the inducement, fraud in the execution, usury, and breaches of contractual and fiduciary obligations by Mortgagee or "Trustee" on the Deed of Trust, "Mortgage Agents," "Loan Originators," "Loan Seller," "Mortgage Aggregator," "Trustee of Pooled Assets," "Trustee or officers of Structured Investment Vehicle," "Investment Banker," "Trustee of Special Purpose Vehicle/Issuer of Certificates of 'Asset-Backed Certificates,'" "Seller of 'Asset-Backed' Certificates (shares or bonds)," "Special Servicer" and Trustee, respectively, of certain mortgage loans pooled together in a trust fund;

- Defendants have concocted a carefully crafted connivance wherein Lender conspired with Agents, et al, to strip Petitioner of Petitioner's equity in the property by inducing Plaintiff to enter into a predatory loan inflated loan product;

- Lender received unjust enrichment in the amount of 5% of each payment made late to Lender while Lender and Lender's assigns acted as servicer of the note;

- Lender and Lender's assigns, who acted as servicer in place of Lender, profited by

ORIGINAL PETITION

handling the foreclosure process on a contract Lender designed to have a high probability of default;

- Lender intended to defraud Investor by converting the promissory note into a security instrument and selling same to Investor;

- Lender intended to defraud Investor and the taxpayers of the United States by withholding the lien document from the sale of the promissory note in order that Lender could then hold the lien for three years, then prepare and file Internal Revenue Form 1099a and falsely claim the full lien amount as abandoned funds and deduct same from Lender's income tax obligation;

- Lender defrauded backers of derivatives by betting on the failure of the promissory note the lender designed to default;

- participant Defendants, et al, in the securitization scheme described herein have devised business plans to reap millions of dollars in profits at the expense of Petitioner and others similarly situated.

## PETITIONER SEEKS REMEDY

In addition to seeking compensatory, consequential and other damages, Petitioner seeks declaratory relief as to what (if any) party, entity or individual or group thereof is the owner of the promissory note executed at the time of the loan closing, and whether the Deed of Trust (Mortgage) secures any obligation of the Petitioner, and a Mandatory Injunction requiring re-conveyance of the subject property to the Petitioner or, in the alternative a Final Judgment granting Petitioner Quiet Title in the subject property.

### *PETITIONER HAS BEEN HARMED*

Petitioner has suffered significant harm and detriment as a result of the actions of Defendants.

ORIGINAL PETITION                                                                    8 of 8

Such harm and detriment includes economic and non-economic damages, and injuries to Petitioner's mental and emotional health and strength, all to be shown according to proof at trial.

In addition, Petitioner will suffer grievous and irreparable further harm and detriment unless the equitable relief requested herein is granted.

## STATEMENT OF CLAIM

### *DEFENDANTS LACK STANDING*

#### No evidence of Contractual Obligation

Defendants claim a controversy based on a contractual violation by Petitioner but Defendants have failed to produce said contract. Even if Defendants produced evidence of the existence of said contract in the form of an allegedly accurate photocopy of said document, a copy is only hearsay evidence that a contract actually existed at one point in time. A copy, considering the present state of technology, could be easily altered. As Lender only created one original and that original was left in the custody of Lender, it was imperative that Lender protect said instrument.

In as much as the Lender is required to present the original on demand of Petitioner, there can be no presumption of regularity when the original is not so produced. In as much as Lender has refused Petitioner's request of the chain of custody of the security instrument in question by refusing to identify all current and past real parties in interest, there is no way to follow said chain of custody to insure, by verified testimony, that no alterations to the original provisions in the contract have been made. Therefore, the alleged copy of the original is only hearsay evidence that an original document at one time existed. Petitioner maintains that, absent production of admissible evidence of a contractual obligation on the part of Petitioner, Defendants are without standing to invoke the subject matter jurisdiction of the court.

ORIGINAL PETITION                                                        9 of 9

**No Proper Evidence of Agency**

Defendants claim agency to represent the principal in a contractual agreement involving Petitioner, however, Defendants have failed to provide any evidence of said agency other than a pronouncement that agency has been assigned by some person, the true identity and capacity of whom has not been established. Defendants can hardly claim to be agents of a principal then refuse to identify said principal. All claims of agency are made from the mouth of the agent with no attempt to provide admissible evidence from the principal.

Absent proof of agency, Defendants lack standing to invoke the subject matter jurisdiction of the court.

**Special Purpose Vehicle**

Since the entity now claiming agency to represent the holder of the security instrument is not the original lender, Petitioner has reason to believe that the promissory note, upon consummation of the contract, was converted to a security and sold into a special purpose vehicle and now resides in a Real Estate Mortgage Investment Conduit (REMIC)   as defined by the Internal Revenue Code and as such, cannot be removed from the REMIC as such would be a prohibited transaction.   If the mortgage was part of a special purpose vehicle and was removed on consideration of foreclosure, the real party in interest would necessarily be the trustee of the special purpose vehicle. Nothing in the pleadings of Defendants indicates the existence of a special purpose vehicle, and the lack of a proper chain of custody documentation gives Petitioner cause to believe defendant is not the proper agent of the real party in interest.

*CRIMINAL CONSPIRACY AND THEFT*

Defendants, by and through Defendant's Agents, conspired with other Defendants, et al, toward

ORIGINAL PETITION                                                                10 of 10

a criminal conspiracy to defraud Petitioner.  Said conspiracy but are not limited to acts of negligence, breach of fiduciary duty, common law fraud, fraud by non-disclosure, and tortuous acts of conspiracy and theft, to include but not limited to, the assessment of improper fees to Petitioner by Lender, which were then used to fund the improper payment of commission fees to Agent in order to induce Agent to violate Agent's fiduciary duty to Petitioner.

### *AGENT PRACTICED UP-SELLING*

By and through the above alleged conspiracy, Agent practiced up-selling to Petitioner.  In so doing, Agent violated the trust relationship actively cultivated by Agent and supported by fact that Agent was licensed by the state.  Agent further defrauded Petitioner by failing to disclose Agent's conspiratorial relationship to Lender,  Agent violated Agent's fiduciary duty to Petitioner and the duty to provide fair and honest services, through a series of carefully crafted connivances, wherein Agent proactively made knowingly false and misleading statements of alleged fact to Petitioner, and by giving partial disclosure of facts intended to directly mislead Petitioner for the purpose of inducing Petitioner to make decisions concerning the acceptance of a loan product offered by the Lender.  Said loan product was more expensive than Petitioner could legally afford. Agent acted with full knowledge that Petitioner would have made a different decision had Agent given complete disclosure.

### *FRAUDULENT INDUCEMENT*

Lender maliciously induced Petitioner to accept a loan product, Lender knew, or should have known, Petitioner could not afford in order to unjustly enrich Lender.

### *EXTRA PROFIT ON SALE OF PREDATORY LOAN PRODUCT*

Said more expensive loan product was calculated to produce a higher return when sold as a

ORIGINAL PETITION                                                                            11 of 11

security to an investor who was already waiting to purchase the loan as soon as it could be consummated.

### Extra Commission for Late Payments

Lender acted with deliberate malice in order to induce Petitioner to enter into a loan agreement that Lender intended Petitioner would have difficulty paying. The industry standard payment to the servicer for servicing a mortgage note is 3% of the amount collected. However, if the borrower is late on payments, a 5% late fee is added and this fee is retained by the servicer. Thereby, the Lender stands to receive more than double the regular commission on collections if the borrower pays late.

### Extra Income for Handling Foreclosure

Lender acted with deliberate malice in order to induce petitioner to enter into a loan agreement on which Lender intended petitioner to default. In case of default, the Lender, acting as servicer, receives considerable funds for handling and executing the foreclosure process.

### Credit Default Swap Gambling

Lender, after deliberately creating a loan intended to default is now in a position to bet on credit default swap, commonly referred to as a derivative as addressed more fully below. Since Lender designed the loan to fail, betting on said failure is essentially a sure thing.

### *LENDER ATTEMPTING TO FRAUDULENTLY COLLECT ON VOID LIEN*

Lender sold the security instrument after closing and received consideration in an amount in excess of the lien held by Lender. Since Lender retained the lien document upon the sale of the

ORIGINAL PETITION                                                          12 of 12

security instrument, Lender separated the lien from said security instrument, creating a fatal and irreparable flaw.

When Lender received consideration while still holding the lien and said consideration was in excess of the amount of the lien, Lender was in a position such that he could not be harmed and could not gain standing to enforce the lien. The lien was, thereby, rendered void.

Since the separation of the lien from the security instrument creates such a considerable concern, said separation certainly begs a question: "Why would the Lender retain the lien when selling the security instrument?"

When you follow the money the answer is clear. The Lender will hold the lien for three years, then file an IRS Form 1099a and claim the full amount of the lien as abandoned funds and deduct the full amount from Lender's tax liability, thereby, receiving consideration a second time.

Later, in the expected eventuality of default by petitioner, Lender then claimed to transfer the lien to the holder of the security, however, the lien once satisfied, does not gain authority just because the holder, after receiving consideration, decides to transfer it to someone else.

### *LENDER PROFIT BY CREDIT DEFAULT SWAP DERIVATIVES*

Lender further stood to profit by credit default swaps in the derivatives market, by way of inside information that Lender had as a result of creating the faulty loans sure to default. Lender was then free to invest on the bet that said loan would default and stood to receive unjust enrichment a third time. This credit default swap derivative market scheme is almost totally responsible for the stock market disaster we now experience as it was responsible for the stock market crash in 1907.

ORIGINAL PETITION                                                                 13 of 13

### *LENDER CONSPIRED WITH APPRAISER*

Lender, in furtherance of the above referenced conspiracy, conspired with appraiser for the purpose of preparing an appraisal with a falsely stated price, in violation of appraiser's fiduciary duty to Petitioner and appraiser's duty to provide fair and honest services, for the purpose of inducing Petitioner to enter into a loan product that was fraudulent toward the interests of Petitioner.

### *LENDER CONSPIRED WITH TRUSTEE*

Lender conspired with the trust Agent at closing to create a condition of stress for the specific purpose of inducing Petitioner to sign documents without allowing time for Petitioner to read and fully understand what was being signed.

The above referenced closing procedure was a carefully crafted connivance, designed and intended to induce Petitioner, through shame and trickery, in violation of trustee's fiduciary duty to Petitioner and the duty to provide fair and honest services, to sign documents that Petitioner did not have opportunity to read and fully understand, thereby, denying Petitioner full disclosure as required by various consumer protection statutes.

### *DECEPTIVE ADVERTISING AND OTHER UNFAIR BUSINESS PRACTICES*

In the manner in which Defendants have carried on their business enterprises, they have engaged in a variety of unfair and unlawful business practices prohibited by *15 USC Section 45* et seq. (Deceptive Practices Act).

Such conduct comprises a pattern of business activity within the meaning of such statutes, and has directly and proximately caused Petitioner to suffer economic and non-economic harm and

ORIGINAL PETITION                                                              14 of 14

detriment in an amount to be shown according to proof at trial of this matter.

### *EQUITABLE TOLLING FOR TILA AND RESPA*

The Limitations Period for Petitioners' Damages Claims under TILA and RESPA should be Equitably Tolled due to the DEFENDANTS' Misrepresentations and Failure to Disclose.

Any claims for statutory and other money damages under the Truth in Lending Act *(15 U.S.C. § 1601*, et. seq.) and under the Real Estate Settlement Procedures Act *(12 U.S.C. § 2601* et. seq.) are subject to a one-year limitations period; however, such claims are subject to the equitable tolling doctrine. The Ninth Circuit has interpreted the TILA limitations period in § 1640(e) as subject to equitable tolling. In *King v. California, 784 F.2d 910 (9th Cir.1986),* the court held that given the remedial purpose of TILA, the limitations period should run from the date of consummation of the transaction, but that "the doctrine of equitable tolling may, in appropriate circumstances, suspend the limitations period until the borrower discovers or has reasonable opportunity to discover the fraud or nondisclosures that form the basis of the TILA action." *King v. California, 784 F.2d 910, 915 9*th Cir. 1986).

Likewise, while the Ninth Circuit has not taken up the question whether *12 U.S.C. § 2614,* the anti-kickback provision of **RESPA,** is subject to equitable tolling, other Courts have, and hold that such limitations period may be equitably tolled. The Court of Appeals for the District of Columbia held that § 2614 imposes a strictly jurisdictional limitation, *Hardin v. City Title & Escrow Co., 797 F.2d 1037, 1039-40 (D.C. Cir. 1986),* while the Seventh Circuit came to the opposite conclusion. *Lawyers Title Ins. Corp. v. Dearborn Title Corp., 118 F.3d 1157, 1164 (7th Cir. 1997).* District courts have largely come down on the side of the Seventh Circuit in holding that the one-year limitations period in § 2614 is subject to equitable tolling. See, e.g., *Kerby v. Mortgage Funding Corp., 992 F.Supp. 787, 791-98 (D.Md.1998); Moll v. U.S. Life Title Ins. Co., 700 F.Supp. 1284, 1286-89 (S.D.N.Y.1988).* Importantly, the Ninth Circuit, as noted above, has

ORIGINAL PETITION                                                                    15 of 15

interpreted the TILA limitations period in *15 U.S.C. § 1640* as subject to equitable tolling; the language of the two provisions is nearly identical. *King v. California, 784 F.2d at 914*. While not of precedential value, this Court has previously found both the TILA and **RESPA** limitations periods to be subject to equitable tolling. *Blaylock v. First American Title Ins. Co., 504 F.Supp.2d 1091*, (W.D. Wash. 2007). 1106-07.

The Ninth Circuit has explained that the doctrine of equitable tolling "focuses on excusable delay by the Petitioner," and inquires whether "a reasonable Petitioner would ... have known of the existence of a possible claim within the limitations period." *Johnson v. Henderson, 314 F.3d 409, 414 (9th Cir.2002), Santa Maria v. Pacific Bell, 202 F.3d 1170, 1178 (9th Cir.2000).* Equitable tolling focuses on the reasonableness of the Petitioner's delay and does not depend on any wrongful conduct by the Defendants. *Santa Maria.* at 1178.

## *BUSINESS PRACTICES CONCERNING DISREGARDING OF UNDERWRITING STANDARDS*

Traditionally, Lenders required borrowers seeking mortgage loans to document their income and assets by, for example, providing W-2 statements, tax returns, bank statements, documents evidencing title, employment information, and other information and documentation that could be analyzed and investigated for its truthfulness, accuracy, and to determine the borrower's ability to repay a particular loan over both the short and long term. Defendants deviated from and disregarded these standards, particularly with regard to its riskier and more profitable loan products.

### Low-Documentation/No-Documentation Loans.

Driven by its desire for market share and a perceived need to maintain competitiveness with the likes of Countrywide, Defendants began to introduce an ever increasing variety of low and no

documentation loan products, including the HARMs and HELOCs described hereinabove, and began to deviate from and ease its underwriting criteria, and then to grant liberal exceptions to the already eased underwriting standards to the point of disregarding such standards. This quickened the loan origination process, allowing for the generation of more and more loans which could then be resold and/or securitized in the secondary market.

Defendants marketed no-documentation/low-documentation loan programs that included HARMs and HELOCs, among others, in which loans were given based on the borrower's "stated income" or "stated assets" (SISA) neither of which were verified. Employment was verbally confirmed, if at all, but not further investigated, and income, if it was even considered as a factor, was to be roughly consistent with incomes in the types of jobs in which the borrower was employed. When borrowers were requested to document their income, they were able to do so through information that was less reliable than in a full-documentation loan.

For stated income loans, it became standard practice for loan processors, loan officers and underwriters to rely on www.salary.com to see if a stated income was reasonable. Such stated income loans, emphasizing loan origination from a profitability standpoint at the expense of determining the ability of the borrower to repay the loan from an underwriting standpoint, encouraged the overstating and/or fabrication of income.

**Easing of Underwriting Standards**

In order to produce more loans that could be resold in the secondary mortgage market, Defendants also relaxed, and often disregarded, traditional underwriting standards used to separate acceptable from unacceptable risk. Examples of such relaxed standards were reducing the base FICO score needed for a SISA loan.

Other underwriting standards that Defendants relaxed included qualifying interest rates (the rate

ORIGINAL PETITION                                                    17 of 17

used to determine whether borrowers can afford the loan), loan to value ratios (the amount of loan(s) compared to the appraised/sale price of the property, whichever is lower), and debt-to-income ratios (the amount of monthly income compared to monthly debt service payments and other monthly payment obligations.

With respect to HARMS, Defendants underwrote loans without regard to the borrower's long-term financial circumstances, approving the loan based on the initial fixed rate without taking into account whether the borrower could afford the substantially higher payment that would inevitably be required during the remaining term of the loan.

With respect to HELOCs, Defendants underwrote and approved such loans based only on the borrower's ability to afford the interest-only payment during the initial draw period of the loan, rather than on the borrower's ability to afford the subsequent, fully amortized principal and interest payments.

As Defendants pushed to expand market share, they eased other basic underwriting standards. For example, higher loan-to-value (LTV) and combined loan-to-value (CLTV) ratios were allowed. Likewise, higher debt-to-income (DTI) ratios were allowed. At the same time that they eased underwriting standards the Defendants also were encouraging consumers to go further into debt in order to supply the very lucrative aftermarket of mortgage backed securities. The relaxed underwriting standards created the aftermarket supply they needed. As a result, the Defendants made it easy for the unwary consumer to take on more debt than he could afford by encouraging unsound financial practices, all the while knowing defaults would occur more and more frequently as the credit ratios of citizens reached the limit of the new relaxed underwriting standards.

Defendants knew, or in the exercise of reasonable care should have known, from its own underwriting guidelines industry standards that it was accumulating and selling/reselling risky

ORIGINAL PETITION                                                                18 of 18

loans that were likely to end up in default. However, as the pressure mounted to increase market share and originate more loans, Defendants began to grant "exceptions" even to its relaxed underwriting guidelines. Such was the environment that loan officers and underwriters were, from time to time, placed in the position of having to justify why they did not approve a loan that failed to meet underwriting criteria.

**Risk Layering**

Defendants compromised its underwriting even further by risk layering, i.e. combining high risk loans with one or more relaxed underwriting standards.

Defendants knew, or in the exercise of reasonable care should have known, that layered risk would increase the likelihood of default. Among the risk layering Defendants engaged in were approving HARM loans with little to no down payment, little to no documentation, and high DTI/LTV/CLTV ratios. Despite such knowledge, Defendants combined these very risk factors in the loans it promoted to borrowers.

Loan officers and mortgage Agents aided and abetted this scheme by working closely with other mortgage Lenders/mortgage bankers to increase loan originations, knowing or having reason to believe that Defendants and other mortgage Lenders/mortgage bankers with whom they did business ignored basic established underwriting standards and acted to mislead the borrower, all to the detriment of the borrower and the consumer of loan products..

Petitioner is informed and believe, and on that basis allege, that Defendants, and each of them, engaged and/or actively participated in, authorized, ratified, or had knowledge of, all of the business practices described above in paragraphs 30-42 of this Complaint

*UNJUST ENRICHMENT*

ORIGINAL PETITION                                                    19 of 19

Petitioner is informed and believes that each and all of the Defendants received a benefit at Petitioner's expense, including but not limited to the following: To the Agent, commissions, yield spread premiums, spurious fees and charges, and other "back end" payments in amounts to be proved at trial; To the originating Lender, commissions, incentive bonuses, resale premiums, surcharges and other "back end" payments in amounts to be proved at trial; To the investors, resale premiums, and high rates of return; To the servicers including EMS, servicing fees, percentages of payment proceeds, charges, and other "back end" payments in amounts to be proved at trial; To all participants, the expectation of future revenues from charges, penalties and fees paid by Petitioner when the unaffordable LOAN was foreclosed or refinanced.

By their misrepresentations, omissions and other wrongful acts alleged heretofore, Defendants, and each of them, were unjustly enriched at the expense of Petitioner, and Petitioner was unjustly deprived, and is entitled to restitution in the amount of $.

### CLAIM TO QUIET TITLE.

Petitioner properly averred a claim to quiet title. Petitioner included both the street address, and the Assessor's Parcel Number for the property. Petitioner has set forth facts concerning the title interests of the subject property. Moreover, as shown above, Petitioner's claims for rescission and fraud are meritorious. As such, Petitioner's bases for quiet title are meritorious as well.

Defendants have no title, estate, lien, or interest in the Subject Property in that the purported power of sale contained in the Deed of Trust is of no force or effect because Defendants' security interest in the Subject Property has been rendered void and that the Defendants are not the holder in due course of the Promissory Note. Moreover, because Petitioner properly pled all Defendants' involvement in a fraudulent scheme, all Defendants are liable for the acts of its co-conspirators,

ORIGINAL PETITION                                                                 20 of 20

"a Petitioner is entitled to damages from those Defendants who concur in the tortuous scheme with knowledge of its unlawful purpose." *Wyatt v. Union Mortgage Co., 24 Cal. 3d 773, 157 Cal. Rptr. 392, 598 P.2d 45 (1979); Novartis Vaccines and Diagnostics, Inc. v. Stop Huntingdon Animal Cruelty USA, Inc., 143 Cal. App. 4th 1284, 50 Cal. Rptr. 3d 27 (1st Dist. 2006); Kidron v. Movie Acquisition Corp., 40 Cal. App. 4th 1571, 47 Cal. Rptr. 2d 752 (2d Dist. 1995).*

## *SUFFICIENCY OF PLEADING*

Petitioner has sufficiently pled that relief can be granted on each and every one of the Complaint's causes of action. A complaint should not be dismissed "unless it appears beyond doubt that the Petitioner can prove no set of facts in support of Petitioner claim which would entitle Petitioner to relief." *Housley v. U.S. (9th Cir. Nev. 1994) 35 F.3d 400, 401.* "All allegations of material fact in the complaint are taken as true and construed in the light most favorable to Petitioner." *Argabright v. United States, 35 F.3d 1476, 1479 (9th Cir. 1996).*

Attendant, the Complaint includes a "short, plain statement, of the basis for relief." Fed. Rule Civ. Proc. 8(a). The Complaint contains cognizable legal theories, sufficient facts to support cognizable legal theories, and seeks remedies to which Petitioner is entitled. *Balistreri v. Pacifica Police Dept., 901 F.2d 696, 699 (9th Cir. 1988); King v. California, 784 F.2d 910, 913 (9th Cir. 1986).* Moreover, the legal conclusions in the Complaint can and should be drawn from the facts alleged, and, in turn, the court should accept them as such. *Clegg v. Cult Awareness Network, 18 F.3d 752* (9th Cir, 1994). Lastly, Petitioner's complaint contains claims and has a probable validity of proving a "set of facts" in support of their claim entitling them to relief. *Housley v. U.S. (9th Cir. Nev. 1994) 35 F.3d 400, 401.* Therefore, relief as requested herein should be granted.

## CAUSES OF ACTION

### *BREACH OF FIDUCIARY DUTY*

Defendants Agent, appraiser, trustee, Lender, et al, and each of them, owed Petitioner a fiduciary duty of care with respect to the mortgage loan transactions and related title activities involving the Trust Property.

Defendants breached their duties to Petitioner by, *inter alia,* the conduct described above. Such breaches included, but were not limited to, ensuring their own and Petitioners' compliance with all applicable laws governing the loan transactions in which they were involved, including but not limited to, TILA, HOEPA, **RESPA** and the Regulations X and Z promulgated there under.

Defendant's breaches of said duties were a direct and proximate cause of economic and non-economic harm and detriment to Petitioner(s).

Petitioner did suffer economic, non-economic harm, and detriment as a result of such conduct, all to be shown according to proof at trial of this matter.

### *CAUSE OF ACTION - NEGLIGENCE/NEGLIGENCE PER SE*

Defendants owed a general duty of care with respect to Petitioners, particularly concerning their duty to properly perform due diligence as to the loans and related transactional issues described hereinabove.

In addition, Defendants owed a duty of care under TILA, HOEPA, **RESPA** and the Regulations X and Z promulgated there under to, among other things, provide proper disclosures concerning the terms and conditions of the loans they marketed, to refrain from marketing loans they knew or should have known that borrowers could not afford or maintain, and to avoid paying undue compensation such as "yield spread premiums" to mortgage Agents and loan officers.

Defendants knew or in the exercise of reasonable care should have known, that the loan

transactions involving Petitioner and other persons similarly situated were defective, unlawful, violative of federal and state laws and regulations, and would subject Petitioner to economic and non-economic harm and other detriment.

Petitioner is among the class of persons that TILA, HOEPA, **RESPA** and the Regulations X and Z promulgated there under were intended and designed to protect, and the conduct alleged against Defendants is the type of conduct and harm which the referenced statutes and regulations were designed to deter.

As a direct and proximate result of Defendant's negligence, Petitioner suffered economic and non-economic harm in an amount to be shown according to proof at trial.

### *AGENT: COMMON LAW FRAUD*

If any Agents' misrepresentations made herein were not intentional, said misrepresentations were negligent. When the Agents made the representations alleged herein, he/she/it had no reasonable ground for believing them to be true.

Agents made these representations with the intention of inducing Petitioner to act in reliance on these representations in the manner hereafter alleged, or with the expectation that Petitioner would so act.

Petitioner is informed and believes that Agent et al, facilitated, aided and abetted various Agents in their negligent misrepresentation, and that various Agents were negligent in not implementing procedures such as underwriting standards oversight that would have prevented various Agents from facilitating the irresponsible and wrongful misrepresentations of various Agents to Defendants.

ORIGINAL PETITION                                                    23 of 23

Petitioner is informed and believes that Agent acted in concert and collusion with others named herein in promulgating false representations to cause Petitioner to enter into the LOAN without knowledge or understanding of the terms thereof.

As a proximate result of the negligent misrepresentations of Agents as herein alleged, the Petitioner sustained damages, including monetary loss, emotional distress, loss of credit, loss of opportunities, attorney fees and costs, and other damages to be determined at trial. As a proximate result of Agents' breach of duty and all other actions as alleged herein, Defendants has suffered severe emotional distress, mental anguish, harm, humiliation, embarrassment, and mental and physical pain and anguish, all to Petitioner's damage in an amount to be established at trial.

### PETITIONER PROPERLY AVERRED A CLAIM FOR BREACH OF THE IMPLIED COVENANT OF GOOD FAITH AND FAIR DEALING.

Petitioner properly pled Defendants violated the breach of implied covenant of good faith and fair dealing. "Every contract imposes upon each party a duty of good faith and fair dealing in its performance and its enforcement." *Price v. Wells Fargo Bank, 213 Cal.App.3d 465, 478, 261 Cal. Rptr. 735 (1989);* Rest.2d Contracts § 205. A mortgage Agent has fiduciary duties. *Wyatt v. Union Mortgage Co., (1979) 24 Cal. 3d. 773.* Further, In *Jonathan Neil & Associates, Inc. v Jones, (2004) 33 Cal. 4th 917,* the court stated:

In the area of insurance contracts the covenant of good faith and fair dealing has taken on a particular significance, in part because of the special relationship between the insurer and the insured. The insurer, when determining whether to settle a claim, must give at least as much consideration to the welfare of its insured as it gives to its own interests. . . The standard is premised on the insurer's obligation to protect the insured's interests . . . *Id. at 937.*

ORIGINAL PETITION                                                    24 of 24

Likewise, there is a special relationship between an Agent and borrower. "A person who provides Agency services to a borrower in a covered loan transaction by soliciting Lenders or otherwise negotiating a consumer loan secured by real property, is the fiduciary of the consumer...this fiduciary duty [is owed] to the consumer regardless of whom else the Agent may be acting as an Agent for . . . The fiduciary duty of the Agent is to deal with the consumer in *good faith.* If the *Agent knew or should have known that the Borrower will or has a likelihood of defaulting ... they have a fiduciary duty to the borrower not* to place them in that loan." (California Department of Real Estate, *Section 8: Fiduciary Responsibility,* www.dre.ca.gov). [*Emphasis Added*].

All Defendants, willfully breached their implied covenant of good faith and fair dealing with Petitioner when Defendants: (1) Failed to provide all of the proper disclosures; (2) Failed to provide accurate Right to Cancel Notices; (3) Placed Petitioner into Petitioner's current loan product without regard for other more affordable products; (4) Placed Petitioner into a loan without following proper underwriting standards; (5) Failed to disclose to Petitioner that Petitioner was going to default because of the loan being unaffordable; (6) Failed to perform valid and /or properly documented substitutions and assignments so that Petitioner could ascertain Petitioner rights and duties; and (7) Failed to respond in good faith to Petitioner's request for documentation of the servicing of Petitioner's loan and the existence and content of relevant documents. Additionally, Defendants breached their implied covenant of good faith and fair dealing with Petitioner when Defendants initiated foreclosure proceedings even without the right under an alleged power of sale because the purported assignment was not recorded and by willfully and knowingly financially profiting from their malfeasance. Therefore, due to the special relationship inherent in a real estate transaction between Agent and borrower, *and* all Defendants' participation in the conspiracy, the Motion to Dismiss should be denied.

### *CAUSE OF ACTION VIOLATION OF TRUTH IN LENDING ACT 15 U.S.C. §1601 ET SEQ*

Petitioner hereby incorporates by reference, re-pleads and re-alleges each and every allegation contained in all of the paragraphs of the General Allegations and Facts Common to All Causes of Action as though the same were set forth herein.

Petitioner is informed and believes that Defendant's violation of the provisions of law rendered the credit transaction null and void, invalidates Defendant's claimed interest in the Subject Property, and entitles Petitioner to damages as proven at trial.

### INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS

The conduct committed by Defendants, driven as it was by profit at the expense of increasingly highly leveraged and vulnerable consumers who placed their faith and trust in the superior knowledge and position of Defendants, was extreme and outrageous and not to be tolerated by civilized society.

Defendants either knew that their conduct would cause Petitioner to suffer severe emotional distress, or acted in conscious and/or reckless disregard of the probability that such distress would occur.

Petitioner did in fact suffer severe emotional distress as an actual and proximate result of the conduct of Defendants as described hereinabove.

As a result of such severe emotional distress, Petitioner suffered economic and non economic harm and detriment, all to be shown according to proof at trial of this matter.

Petitioner demands that Defendants provide Petitioner with release of lien on the lien signed by Petitioner and secure to Petitioner quite title;

Petitioner demands Defendants disgorge themselves of all enrichment received from Petitioner

ORIGINAL PETITION                                              26 of 26

as payments to Defendants based on the fraudulently secured promissory note in an amount to be calculated by Defendants and verified to Petitioner;

Petitioner further demands that Defendants pay to Petitioner an amount equal to treble the amount Defendants intended to defraud Petitioner of which amount Petitioner calculated to be equal to $78,326.22

## PRAYER

WHEREFORE, Petitioner prays for judgment against the named Defendants, and each of them, as follows:

For an emergency restraining order enjoining lender and any successor in interest from foreclosing on Petitioner's Property pending adjudication of Petitioner's claims set forth herein;

For a permanent injunction enjoining Defendants from engaging in the fraudulent, deceptive, predatory and negligent acts and practices alleged herein;

For quiet title to Property;

For rescission of the loan contract and restitution by Defendants to Petitioner according to proof at trial;

For disgorgement of all amounts wrongfully acquired by Defendants according to proof at trial;

For actual monetary damages in the amount .

For pain and suffering due to extreme mental anguish in an amount to be determined at trial.

For pre-judgment and post-judgment interest according to proof at trial;

ORIGINAL PETITION                                              27 of 27

For punitive damages according to proof at trial in an amount equal to $78,326.22.

For attorney's fees and costs as provided by statute; and,

For such other relief as the Court deems just and proper.

**Respectfully Submitted,**


Tamie Richardson


ORIGINAL PETITION