Case 1:10-cv-03073-PA   Document 91-1   Filed 03/18/11   Page 1 of 9   Page ID#: 913

Exhibit 1
Case # 10-3073PA

# WAREHOUSE FLOWCHART
# Sale to Aggregator
## Day 1 Activities





**At this point, the loan is deemed to be "wet funded" until all collateral documents are received from closing table**



MORTGAGE BANKERS ASSOCIATION
Investing in communities

# WAREHOUSE FLOWCHART
# Sale to Aggregator
## Day 2-8 Activities



Closing Agent completes closing documentation including collateral documents

Documents are shipped to Warehouse Bank

Documents placed in warehouse collateral file

Warehouse Bank reviews documents for completeness

Documents are stored in fireproof vault

Warehouse Bank approves collateral package

**At this point, the loan is deemed to be "dry funded" and bank's records are updated**



MORTGAGE BANKERS ASSOCIATION®
Investing in communities

Case 1:10-cv-03073-PA   Document 91-1   Filed 03/18/11   Page 3 of 9   Page ID#: 915

# WAREHOUSE FLOWCHART
## Sale to Aggregator
### Day 7-20 Activities



Loan files sent to Buyer on Bailee Letter

Buyer of loans

Review of loan files for completeness

Buyer sends funds to pay off Warehouse Lender

Warehouse Lender receives funds from buyer

Warehouse Lender removes from Warehouse Line Receivable and sends Net Proceeds to Mortgage Lender



MORTGAGE BANKERS ASSOCIATION®
Investing in communities



**MORTGAGE BANKERS ASSOCIATION**
Investing in communities

February 5, 2009

The Honorable Timothy F. Geithner
Secretary of the Treasury
U.S. Department of the Treasury
1500 Pennsylvania Avenue, NW
Washington, DC 20220

Dear Secretary Geithner:

The Mortgage Bankers Association[1] (MBA) would like your assistance with actions to restore liquidity to the warehouse lending sector. This assistance by the federal government is urgently needed to maintain the mortgage funding structure borrowers depend upon, especially borrowers who rely on independent, non-depository lenders. MBA believes the federal government could be helpful in a variety of ways in keeping these lines of credit available and functioning effectively. Our initial recommendations, detailed below, include a short-term federal guarantee of warehouse lines that are collateralized by Fannie Mae, Freddie Mac, FHA, VA, and RHS-eligible mortgages, and modifying the present risk-based capital treatment of warehouse loans to facilitate the expansion of warehouse lending.

Improving liquidity for warehouse lines of credit not only addresses the short-term mismatch of funds to meet the recent increase in consumer demand, but it also provides longer term benefits by facilitating the normalization of mortgage loan production and residential real estate markets. The following describes this emerging credit shortage situation and proposed solutions.

## Background

MBA is concerned about the growing threat to a source of capital for many mortgage lenders – warehouse lenders going out of business, terminating, or adding restrictions to their warehouse lines of credit are causing independent (non-depository) mortgage

---

[1] The Mortgage Bankers Association (MBA) is the national association representing the real estate finance industry, an industry that employs more than 370,000 people in virtually every community in the country. Headquartered in Washington, D.C., the association works to ensure the continued strength of the nation's residential and commercial real estate markets; to expand homeownership and extend access to affordable housing to all Americans. MBA promotes fair and ethical lending practices and fosters professional excellence among real estate finance employees through a wide range of educational programs and a variety of publications. Its membership of over 2,400 companies includes all elements of real estate finance: mortgage companies, mortgage brokers, commercial banks, thrifts, Wall Street conduits, life insurance companies and others in the mortgage lending field. For additional information, visit MBA's Web site: www.mortgagebankers.org.

Department of Treasury
February 5, 2009
Page 2 of 6

lenders to struggle to maintain their ability to serve borrowers. Warehouse lenders serve as a crucial short-term funding source for mortgage bankers, specifically those that are non-depository institutions, which help maintain adequate capacity for all forms of mortgage originations, including home purchases, refinance and modifications for troubled borrowers, and other transactions. According to *National Mortgage News*, there were approximately 90 warehouse lenders in 2007; today there are approximately 40 warehouse lenders.

A warehouse line is a line of credit provided to a mortgage banking company to fund the closing of mortgages. It is a short-term revolving line of credit provided to a mortgage banking company to fund the closing of mortgages from the closing table to sale in the secondary market. The mortgage note is used as collateral for interim financing until the mortgage is sold and delivered to the permanent investor. Mortgage bankers draw upon the line of credit to fund a mortgage at closing or to purchase a closed loan from another originator. The line of credit is paid off when the loan is sold to the end investor. Warehouse lending contributes to the financial capacity the industry provides for originating loans for first-time homebuyers; refinancing troubled borrowers into new mortgages; assisting other borrowers in securing credit for residential mortgage transactions; and originating loans for the purchase, refinance or repositioning of rental properties.

Warehouse lending capacity has declined dramatically – from over $200 billion in 2007 to approximately $20 to $25 billion in 2008, a decline exceeding 85 percent. For the originator that depends solely on warehouse lines of credit, this reduction could extinguish its lending business and adversely impact the borrowers in its market, stifling the real estate recovery before it gets off the ground.

Recently, several commercial banks have purchased other institutions that are active in the warehouse lending business. The future of warehouse business appears uncertain because many banks have pulled-back on warehouse lines, ceased to issue new lines or stopped increasing existing lines, and increased pricing and restricted terms have closed down lines altogether. These actions have left many non-depository lenders without adequate and viable sources of capital.

Other warehouse lenders may not continue to extend credit to lenders because of the perceived risk, headline risk or otherwise, of products associated with mortgages, despite the fact that mortgage underwriting is extremely rigorous and conservative today. Mortgage bankers that rely on warehouse lines of credit will be unable to maintain their businesses and cannot serve their local communities if their access to warehouse lines is not maintained.

## Immediate Solution

MBA has reviewed various alternatives and proposes the following as the most optimal solution to quickly restore liquidity to warehouse lending. Steps should be taken to help maintain existing lines of warehouse credit and create new lines of warehouse lending by providing a short-term federal guarantee of warehouse lines that are collateralized by Fannie Mae, Freddie Mac, FHA, VA, and RHS-eligible mortgages that are held for sale by mortgage lenders. A short-term guarantee of 12-24 months should be available until warehouse market liquidity normalizes. This would help warehouse lenders to be more willing to allocate greater financial resources to warehouse lending because of this government backstop.

MBA believes that the exposure to loss under the guarantee would be minimal since the loans are newly originated and will be sold (and cleared out of warehouse) generally within 15-30 days (thus reducing credit risk), and the blanket lien against forward sale commitments limits the warehouse lenders' exposure to market (interest rate) risk. The guarantee is needed currently to get bank credit or policy committees over the current headline risk of owning mortgages or related mortgage exposures.

MBA also believes that some improvements in current risk-based capital rules should be made on a long-term basis to better reflect the risks inherent in warehouse lending for mortgages.

## Discussion of Warehouse Line Risk and Proposed Risk Weightings

Currently, risk-based capital (RBC) rules for banks and thrifts treat warehouse lines of credit as 100 percent risk rated assets, along with other commercial loan exposures. MBA believes that warehouse lines of credit, if properly managed, have risks comparable to directly originated conventional and government-insured mortgage exposures, and, in the final few days in warehouse, the risk is comparable to holding a government or government agency mortgage-backed security (MBS).

By way of background, warehouse lenders differentiate three stages of the warehouse process:

1) **Wet Funded Stage:**[2] Mortgage warehouse lenders frequently send money to the closing agent prior to the loan closing. The mortgage banker provides the warehouse lender with a trust receipt that serves as collateral until the underlying collateral documentation is received from the closing table. Such

---

[2] The term "wet funding" refers to the ink not being dry on the closing documents. More practically, it is referring to the period between the lender's, or its warehouse lender's, release of funds and its receipt of the collateral documents.

Department of Treasury
February 5, 2009
Page 4 of 6

> documentation includes the mortgage note. The trust receipt is valid collateral for up to 21 days under the Uniform Commercial Code. Most warehouse lenders send the money directly to the closing table, and the mortgage banker, simultaneous with the closing, assigns the mortgage to the warehouse lender. Most warehouse arrangements permit loans to remain in this "wet stage" no more than five to seven days.

2) **Dry Funded Stage:** This stage represents the period that the warehouse lender has possession of the mortgage note and other collateral.

3) **Gestation Repo Stage:** Prior to delivery of a Ginnie Mae, Fannie Mae or Freddie Mac security (government MBS) into the secondary market, the mortgage banker obtains an initial pool certification. Often, the certifying agent is the warehouse lender itself. Upon initial pool certification, the pool is said to be "in gestation" awaiting delivery to the Wall Street takeout investor upon security issuance. Fifteen years ago, Wall Street firms would take delivery at this point and provide gestation repo[3] funding from initial pool certification date to trade settlement. During the last 10 years, commercial banks have added a gestation repo tranche to the typical warehouse line agreement in order not to lose this segment of the warehouse business.

MBA recommends that the following RBC rules be enacted to more properly risk-weight these assets:

1) **Wet Funded Stage:** The current RBC weighting of 100 percent should be maintained until all collateral documents are received from the closing table.

2) **Dry Funded Stage:** Dry funded loans provide as collateral to the warehouse bank the mortgage note and an assignment in blank.[4] These allow the warehouse lender to step into the shoes of the mortgage lender and own these loans if the mortgage lender defaults. The warehouse lender also has a perfected interest in all forward sale agreements. So, not only does the warehouse lender have the ability to own the loan, it can deliver that loan into the secondary market at a pre-determined price. Thus, the warehouse lender has collateral that is perfected, has little credit risk (since newly originated), and has little market risk (since pre-sold into the secondary market). Present RBC rules for mortgage loans held by a bank require from 50 percent to 100 percent RBC weighting, depending on the mortgage's loan-to-value (LTV)

---

[3] A reverse repurchase agreement between mortgage firms and securities dealers. Under the agreement, the mortgage company sells Fannie Mae, Freddie Mac or Ginnie Mae MBS and simultaneously agrees to repurchase them at a future date at a fixed price.

[4] The assignment in blank is a legal document that gives the warehouse lender legal ownership of the mortgage if the warehouse customer defaults on the warehouse line and the warehouse lender needs to liquidate the collateral.

> ratio. The proposed Basel II "standardized approach" provides for RBC weightings from 20 percent to 150 percent depending on the LTV and whether the loan is current. MBA proposes that a RBC weighting of 50 percent be accorded that portion of a warehouse line that is dry funded.
>
> 3) **Gestation Repo Stage:** Upon initial pool certification, a new Ginnie Mae, Fannie Mae or Freddie Mac MBS will be issued in a matter of days. Since the warehouse lender has a blanket lien on all forward sale commitments, these MBSs are pre-sold. Present RBC rules call for zero percent capital on Ginnie Mae MBS and 10 percent on Fannie Mae and Freddie Mac MBS. MBA recommends a RBC weighting of not more than 20 percent for that portion of a warehouse line that is backed by gestation collateral.

The proposed RBC rules would prudently call for capital ratings consistent with or more conservative than if the warehouse bank held the underlying collateral long-term on its balance sheet.

## Solution Limitation

Although this proposal provides a warehouse capacity shortage solution specifically tailored for loans with actual or effective government guarantees (GSE, FHA, VA and RHS-eligible residential and multifamily mortgages), it is not an appropriate solution for non-government guaranteed private label residential, commercial and multifamily loans. In order to address this issue, MBA will work with Congress, Treasury and the administration to craft solutions that provide for increased warehouse lines of credit capacity for private label residential, commercial and multifamily loans. By addressing both government guaranteed and private label loan categories, a complete solution to the capacity shortage for warehouse lines of credit can be developed.

## Conclusion

MBA appreciates the opportunity to share these proposals with you. MBA would like to request a meeting with appropriate Treasury officials to discuss the warehouse shortage situation and proposed solutions. We will follow-up with appropriate staff to schedule a convenient time to meet.

Sincerely,

*John A. Courson*

John A. Courson
President and Chief Executive Officer
Mortgage Bankers Association

CC:   The Honorable Ben S. Bernanke, Board of Governors of the Federal Reserve
         System
      The Honorable John C. Dugan, Office of the Comptroller of the Currency
      The Honorable Sheila C. Bair, Federal Deposit Insurance Corporation
      The Honorable John M. Reich, Office of Thrift Supervision